Good morning. May it please the court. I'm J.D. Fairchild. I represent Martin Misjuns and we're hearing an appeal from a motion to dismiss in the lower court. We have submitted transcripts and briefs on this issue. This argument will highlight some of the issues that we hope the court addresses. The first issue is that the lower court did not apply the 12b6 rule to its decision in the motion to dismiss. As we know that in a motion to dismiss the facts and the complaint should be taken as true, that reasonable inferences should be in favor of plaintiff, and that the court is to address the issue of whether there can be relief and whether the complaint is pled sufficiently. In the lower court what ended up happening and what you'll see is seven pages of transcript where the defendant providing alternative facts. And what you may see today is the city providing alternative facts. And in the brief, the city's brief, there are 18 pages of alternative facts. As you read through the transcript of the lower court you'll find that the judge ultimately adopted the idea of the alternative facts, even going to compare some of the plaintiff's speech with Nazi It's in dispute here. The post would seem to speak for themselves. I agree that the post should speak for themselves. Yes, I mean, there's not, you know, it's there for everybody to see what what he was saying. Yes, but in a motion to dismiss standard, the complaint should be tested for its whether he liked the cartoon or not. And he deviated back it's not going to change what this gentleman said. It is not going to change what this gentleman said, but stuck with that. And we're okay being stuck with that, but that should not have been a reason to dismiss the case at that point in the 12b6 motions hearing. The court, and as you read through the transcript, the judge went so far as to, again, adopt the alternative facts and even deviated from his own opinion written in 2016, Drago v. City of Charlottesville. Judge Moon wrote in that opinion that the government may not prohibit it. How many issues do you have? It struck me as something of a Hail Mary complaint. How many issues do you have? Ten? Judge, we have a total of, I didn't count them out, but close to ten issues. Close to ten issues. You can't count them all. But you don't get to dictate the terms of the case, and you can boil all those ten issues down. It seems to me and to one issue that this is a very typical, conic, pickering public employee speech case that ought to be resolved in accordance with the Supreme Court's conic, pickering balance. I don't think there would be much of a case at all if our client, Mr. Mischens, was committing political acts on public time in a firefighter's uniform or in his personal page, in his personal Facebook page, in his personal life, holding himself as a fire captain and then committing political speech. The issue before the lower court and now before this court is this, that he was on his personal time. He was not claiming to be a fire captain. The Facebook page was his personal page. The posts were his personal page, and those are protected, not protected speech. Excuse me sir, Carl Blum has a question for you. Putting, accepting your position on that, is it, am I correct that the claims against the individuals were initially pled as official capacity claims and that those have all been dismissed? Judge, I believe what's, yeah, before the court is an amended complaint and the personal capacity claims were, were, were dismissed, were dismissed. Okay, so, so what we have is a claims against the municipality, correct? Yes. Based on the actions of agents of the municipality?  And, and, and, and in that situation, doesn't, regardless of the merits of the individual claims, doesn't this come down to the Monell test and whether you satisfied that? The Monell test is going to be part of our argument this morning, my co-counsel. I mean, it's critical, right? At least for any of the federal claims, without Monell, you can't win. Judge, it is, it is important, yes. I don't mean, I mean, importance, one thing, it is the linchpin. Without it, since you don't have individual claims, that's all there is, right? Yes. Okay, thank you. In determining, but I think what's important is for the court to remember that we were at a motion-to-dismiss stage, and that the complaint, as pled, should have been tested on its sufficiency of being pled, and the relief that could be granted. And in this case, the facts weren't taken in the plaintiff's favor, and it will be quite easy to remedy the plaintiff's ills through financial or returning him to his job. So it is important that the court understand that we're not at the litigation stage, we're not at trial stage, we're at the motion-to-dismiss stage, and that standard is very different than what will happen at the jury trial. Just to follow up, I mean, we have a case, Greensboro, City of Greensboro case, that rejected a Monell claim by a firefighter to hold the city liable for the decision of the fire chief, and and so I guess there's two ways you can show Monell liability. One would be the actual conduct was made by a final decision policy decision-maker. I don't know how you get past City of Greensboro on that issue. I'd be interested in hearing that. It seemed, if City of Greensboro is an obstacle to that avenue, it seems like you have to show that you have pled a custom or new policy, so could you address that please? Judge, I will point out that in our complaint we did allege Monell, and those facts and the allegations in that, per the 12b6 standard, should have been weighed in in our client's favor to move past the motion to dismiss. But the facts have to be sufficient to plausibly state a claim based on the law, and you can't just say we have a final decision-maker if we got City of Goldsboro that says a fire chief, unless you have some way to distinguish that. I don't think 12b6 doesn't, I And maybe you can, so I'm trying to invite you to tell me if you're arguing on Monell is that you have a final decision-maker, it seems to me City of Greensboro is a big problem for you. If I'm wrong, please explain why. One of the issues in this case is that there was complaints made by a group called Hill City Pride, and they called in to the mayor, the mayor and the city manager and the fire chief, all had conversations, we even filed a conspiracy claim in the complaint addressing some of the issues between these decision-makers acting in accordance when they terminated. But you alleged in your complaint that the fire, his boss in the fire department was the decision-maker, you didn't reference the mayor, you didn't reference the vice mayor, I mean you have facts about those, but you can't say this person's our decision-maker and now come in here, I don't think, and say well someone else was the decision-maker. Judge, our complaint did lay out facts about the conversations between those people, but I will have to concede that the notice of intent to dismiss was delivered by the fire chief. Well it's not just what happened factually, when you alleged a claim you said that was the final decision-maker, you didn't say either he or the mayor or the vice mayor or someone else, I mean I'm not fussing at you, that may be fair, I'm just saying if that's the case, how do we deal with Golds Greensboro? I would say that I think, of course we're in this courtroom, but we're parsing words, the fire chief being the final decision-maker is in the complaint, the gentleman who delivered the final letter, the notice of intent to dismiss to our client, that doesn't exclude what happened prior to that. You have some rebuttal time. Thank you. All right. Counsel, I'm having a hard time figuring out what exactly the city did wrong here because you have an individual and you might think he's protesting as an individual, but it's hard for him to shake his association with this city and the particular speech here is about as raw as he gets and that's not a problem for private individual, people can say outrageous things, but it's very hard for him to shake his association and position with the city's fire department and if I were a city official, I would be very concerned about the relationship that the fire department had with the citizens of the city of Pittsburgh and you're talking about speech, what your client is doing is chilling the speech of other people because let's suppose someone has a Black Lives Matter, a poster in their front lawn, there are many of them in Charlottesville and when they see a post like this, they're going to wonder if the fire department is going to treat their homes fairly if a fire breaks out and the same is true, the city has to be concerned about its ability to recruit firefighters who are of a minority race and they're going to look at this and say this is not a hospitable environment for me and I'm not going to sign up for something where somebody is a high official in the department is doing this kind of racism and so this individual is sowing mistrust on the part of citizens who depend upon the fire department to treat their homes fairly and it is constricting the ability of the city to attract able candidates and applicants from all of its citizens and so I'm having trouble figuring out what in the world the city did here that was wrong in trying to resolve those problems. Sure, thank you your honor. First off, I would say as we talked about a little bit in our brief, the heckler's veto. I think that it is a very dangerous position if somebody is a Trump supporter than to suggest that they can't. Are you going to answer my questions? Yes, sir. It seemed to me you were going off on some toot of your own. Answer my questions. Yes, sir. I assume what the court is talking about is the Black Lives Matter post that Mr. Mischens made or statement that he made. In that case, he was talking about the individuals who killed David Dorn, the St. Louis fire captain who was an African-American retired officer who was killed by looters. Mr. Mischens made the statement that we have looters, we have hooligans posing as Black Lives Matter protester who took the life of this African-American gentleman. So I think if the city is reading that as a racist statement, I think the city has simply got its facts wrong. With regard to the transgender comments, again, I think we're on somewhat dangerous ground. We're in a very polarized world right now, Your Honor. We're being in favor of President Trump and supporters. The First Amendment protects the speech per se. You can say totally vile things and we would protect it because we don't want viewpoint discrimination. But there's a separate line of cases and the problem was, from the First Amendment standpoint, was not what he said, however odious it was, and it was unbelievably odious, but the position from which he said it. He's not just a private citizen. He is a public employee. He holds a responsible position in the firefighting bureaucracy and what he said is going to be received by the citizens of as something that the fire department was willing to tolerate and you're saying a municipality cannot take steps to resolve those problems? Again, Judge, as Your Honor pointed out, we're talking about the Pickering-Connick line of cases. I would argue that to make that determination at the 12b6 motion to dismiss Stage Judge would just be improper. I think that goes to the merits of his statements and I think that should have been left for perhaps a Rule 56 summary judgment question. I think that really is a decision on the merits. Did his statements cross the line? Was there a Pickering-Connick issue? I think that really is a merits question, Judge, and not a 12b6 question. If I could address Judge Quattlebaum's question very quickly in my remaining time on Monell, I think the judge is right. Monell is the linchpin of our case. Judge, how we get past the Goldsboro decision is that the employee handbook for Lynchburg City specifically says, and Chief Wormser's notice of intent to dismiss, which was attached with the complaint, he wrote, I am intending to terminate your employment in accordance with the procedures set forth in Chapter 7, Section 6, Subsection M5 of the Personnel Manual. That section states in relevant part, the director considers the and makes a final determination to dismiss. So in Lynchburg, department directors do have final authority on behalf of the city to make termination decisions. Not just the fire chief, but any department director. But in order for municipal liability to attach, the municipality has to have done something wrong. They have to violate a federal right or a constitutional right and the conic pickering balance indicates that if they have a legitimate and significant state interest, they can act on that and there's been no violation of a federal right or a constitutional right under the conic pickering balance, and therefore municipal liability does not follow. And we can talk about policymakers and the rest and that's fine, but there has to be some violation or infraction before liability can attach to anyone. Yes, sir. And judge, I see my time has expired. May I briefly respond? Why don't you wait for rebuttal? Okay. Unless my colleagues have some some questions. We don't have any. Thank you, Your Honor. Troy may please the court. Mhm. Good morning. My name is Jennifer Royer and I'm here on behalf of the city of Lynchburg and very briefly before we get into the substance of the underlying questions of the court, I would like to address the allegations that the district court viewed this from the wrong standard. The allegation is that the city put forward alternative facts and that the district court adopted those facts. However, if you look at the memorandum opinion, memorandum opinion statement of facts very closely tracks those that were set forth in the amended complaint. The allegations that the city made with respect to its reasoning for its decisions are not actually identified in the court's memorandum opinion. So the correct standard was applied, and that really is a non issue before the court. Now, I'd like to discuss Judge Quattle bombs concerns with regards to Monell because, frankly, without Monell, there is no case. And when we look at Monell, it's really important to note that the city has to have done its own unconstitutional act. It is not sufficient for someone to allege that an employee has created an unconstitutional act for which the city ought to be liable. And there are a couple of ways, four ways exactly that the plaintiff could have asserted facts to establish a Monell claim. First, of course, being that there would be an express policy stated in a regulation or an ordinance. Then, of course, there is the final decision making authority. Um, third, there is an omission that events is a deliberate indifference to the rights of the citizens and fourth being that of a customer policy. Now, the facts on the complaint simply do not establish a Monell claim against the city of Lynchburg. Looking at the final of the person with final policy making authority. Honestly, it's an open question based on the amended complaint who the plaintiff thought was the final policy making authority. At various points, he asserts that he was terminated by the fire chief and then he says he was terminated by the fire chief at the direction of the individual defendants. However, looking at the case that we were discussing earlier, the Goldsboro case, the fire chief is not a person with final policy making authority on behalf of the city. So there would have had to have been other allegations actually identifying who that final policy making authority was, and they simply don't do that in this case. Um, in terms of the, uh, I find it hard to believe that, uh, that any municipality would have taken any other action. Um, I mean, they, they did what any municipality would do. Um, and you, you, you can't have a municipal government, which is high officials are broadly distrusted within the citizens who are the subject of that government. And you, you, you, you can't project, um, a hostility to people who might want to become firefighters and are reluctant to take that step because the whole, the firefighter, the whole department has tolerated this person right in its midst. And any municipality would do what this municipality would, would do to clean up its act and communicate a simple message to the citizens of Lynchburg. And that is that this fire department is open to everyone. And it, and it, and it, and it will fight fires without respect to anyone's political point of view. And I come back to the thing where somebody has a sign and black lives matter in their lawn. They're perfectly free to do that in our country. And they would have questions given this man's hostility as to whether those firefighters are going to pass them by if they have a problem in their home. And that is an appalling situation. And the, um, uh, the post here were as bad as raw and virulent as you can get. And that's fine for a private citizen. If they want to spew that stuff, it's okay. But it is not fine for somebody in his position to have said what he said. I do not disagree with you, Your Honor. And in fact, what the city did was on all fours with this court's precedent in the Gretzmacher case out of Howard County. In the Gretzmacher case, there were a series of, um, elements, for lack of a better word, that this that a municipal government can look at in determining whether or not a, um, an employee speech passes muster and whether or not the efficiency of the government is impacted and impaired by that speech. And to be sure, when you look at the notice of the complaint that was given to the complaints from the citizens that was given to Mr Missions pursuant to his firefighter Bill of Rights, and you look at the notice of intent to terminate those those documents, both being a part of the record before this court and being a part of the record before the district court as well. The biggest concern here is that citizens are coming forward saying I have concerns that if I or my family member need assistance that the Mr Missions is called upon to arrive to my residence, he will not give us the care to which we are entitled. Um, specifically, when you think about it, Mr Mr Missions was a fire captain in the department, but he was also a paramedic. And a lot of departments don't necessarily have firefighters and paramedics in the same role, but he was in both roles. And I want to I want to kind of turn this in terms of these individuals thought process that when you call for a paramedic, you are calling when you are in your most vulnerable state, you are in need of life saving measures for you or your family members. And if Mr Missions, having publicly posted his views on individuals who are transgender arrives to your residence and you are in fact transgender and your outward appearance does not match your biological makeup when they take off your clothes, are there going to be critical seconds lost in rendering care? And that was the concern that was expressed to city officials time and time again by these citizen complainants. And of course, that is a huge concern for the city in terms of its obligation. So can I I want to make sure I understand your understand that point and that may that may be sufficient on the merits to say this isn't a violation and and and you're in and it may be 100% right. But it sounds in making that I wonder if you're not essentially saying there is this is part of a policy that the city has that it's not just a decision as to this individual. There is a policy that the city has that if concerns are legitimately or maybe not, maybe whether legitimate or not raised, we don't, we're going to take action. And I'm not saying that's wrong to do that. But I'm wondering if that makes you, it makes it makes us have to decide the merits of it, which you may want us to do, or whether you're, you know, but it seems like in doing that you're walking into prong four of of Manel as I hear you talk. So let me let me answer that point, because I do think that the argument that I made was more towards the merits, because I think it's apparent why the city did what it did. However, in terms of the pleading itself on on a 12 v six standard, looking at the allegations of fact for the purposes of a Monel claim, the city is going to, just like any good corporate steward would investigate any complaints made by anyone against an employee. And that is, you know, if somebody came to my office and they complained about one of my staff members, I'm going to look into that. And it's not necessarily a policy to do so, although there are personnel manuals that say that, you know, this policy or custom, right? So custom? Yes. So we have the express policy. We also have policy or custom. But when we look at policy and custom, we have to look at whether or not the allegations show that the city had a policy or custom, not of investigating complaints against their employees, but whether or not they had a policy or custom of unconstitutional action. And when we look at what constitutes policy or custom, sometimes we look at it in terms Is there a pattern here where you have an instance where the city has violated someone's rights under the Constitution, under the Fourth Amendment, or excuse me, under the First Amendment. In this case, there have been no allegations on the face of this complaint that established that there was a policy or custom of the city to violate an employee's constitutional rights to speech. That's what he would have to show. And he would have to show that not just in his own instance, um, saying that they violated my rights. The First Amendment protections he would have. Why don't the allegations that he made? I think in the complaint that you know that we have zero tolerance, for example, for this type of speech, this type of conduct at a 12 B six stage. Is it reasonable for us to infer that that means this type of stuff, um, is, you can argue it's not a, um, First Amendment violation. And maybe you went on that. But why does that at least not, um, let us infer that that's something that the city does on a more systematic basis. I would ask you to look at the content of that email in which it was asserted. So that was an email from Mary Jane Dolan to the interim city manager, Dr Reed Wodica, in which she expresses her opinion that the city ought not have speech that is harassing or disparaging to citizens. And that is her expressing her own First Amendment protected rights to express her grievances to her city elected representatives. She was not talking about any kind of official capacity in that instance, because, frankly, as a manager managed form of government, the mayor does not have any ability to to extract discipline or to enact discipline against employees. So she in that email in that instance is expressing her personally held belief that the city ought not have a or excuse me, ought to have a zero tolerance policy for employees engaging in hostile speech towards citizens. So your view is that's her personal review, not reflective of a city policy. That is absolutely correct, because and again, you know, elected officials, they don't lose their First Amendment protections when they take the days she did not have any authority of her own to do anything with respect to the any disciplinary issues, any investigative issues because of the type of government that the city of Lynchburg is. So she was expressing to someone who might be in that position to say, Hey, we ought to have a zero tolerance policy for speech that discriminates against our citizens. And that is her protected First Amendment, right? It is not, in fact, a policy or custom of the city. Although I suppose you can make the point that if if there is a policy, the policy is a good one. And the I'm not sure that the record here presents situations where the city had acted inconsistently with what they did in this instance. And so what they did in this instance, if it's reflective of anything, it's reflective of a good policy and the policy that it was reflected, there is no evidence that it was applied in a haphazard way. Now they bring up the question of the fire chief or somebody attending the BLM rally. But that is not a similarly situated individual. That is a whether it's advisable or inadvisable. It's a totally benign action compared to what was done here. So, Your Honor, if I may, because I think you're veering into their equal protection claim, and I just want to close the chapter on the Monell claim and the policy violation or the express policy that's whether or not they asserted an express policy that was violative of his constitutional rights. Whether it's a good policy or otherwise a bad policy really isn't the question. The question is whether or not they have an express policy or a policy or custom that violates someone's rights. And here there was no allegation that any express policy or any policy or custom violated Mr. Mischin's rights. No factual support for that. Now, Your Honor, moving into the equal protection analysis, there is a claim for the 14th Amendment here. Equal protection claims, when you treat it, treating similarly situated individuals in a dissimilar matter. Correct. And these are not, this example is not of a similarly situated individual. As a practical matter, no, Your Honor, it is not. But specifically to the complaint, there are no allegations of fact on the face of the complaint that would show how they are similarly situated. And that is a pleading requirement on an equal protection claim. So the city is not required to treat dissimilar people the same. It's not. And in order to establish We understand that it's in your brief. At this point, I think it would be productive if I ask my friend, Judge Gregory, if he had any, no, any you have any further questions? Thank you. We have no further questions. Okay, Your Honor, I just wanted to ask before I sat down. Is there any particular argument that you wanted to have any more information on? Otherwise, if there were, we would have had questions. Thank you, Your Honor. I will stand on my brief and ask that the court affirm the decision of the city or the district court dismissing the complaint. Thank you. Thank you. Um, Mr Fair time. Just just very briefly. I appreciate your passion for protecting minorities, but I think it's important when you're governing a city and you're managing city employees that we're protecting minorities and we're also protecting what might be considered mainstream or a different type of minority. And I think what the city is getting wrong here is moving to protect one side to the exclusion of another side. Further, I think we are still at a 12 B six standard, and I want to leave that strong with the court to consider. And I want to point out that, um, there is no, that's what you said is just not true because you can't point to an instance of where a minority office holder in the, um, uh, fire department was spewing racist comments against white and the, um, and there's no indication that the city would would would, um, would tolerate that. And so the city is not, there's no showing here that the city is protecting one group as opposed to another because you don't have a minority office holder in the fire department spewing that kind of rhetoric. Judge, it could be argued that the chief of the fire department is a minority and he terminated a white firefighter for speech that he did not like. That was not in uniform, not on company dime and not representing the fire department. So I can only litigate the cases that I'm retained for. And so I don't have an example for you of a minority that I would represent. But I'm in this case and I will, I'm running out of time. So I will leave you with that. Mr Boyer.  Thank you, Your Honor. Um, I would say we actually do have an example in Lynchbury, which, which was, which came out in discovery but was not in the complaint because we learned about it in discovery of a minority firefighter who was spewing racial hatred and the city did not discipline him until after this litigation began and the city felt its hand was forced. But we didn't learn about that until discovery. So that was not anything we could have pleaded in complaint. Um, I would argue judge again, I just, I want to make sure the court is clear that Mr missions was not saying anything critical of BLM. He was saying something critical of hoodlums, um, taking advantage of the BLM protests to kill and loot to kill a black retired firefighter and loot the store that he was being retained as a security guard for that he was abusing the BLM movement. Your Honor, uh, was Mr missions entire point. Um, but with with regard to the court's concern about the city not being open to anyone, I think the firing of Mr missions is a very telling statement that the city is not open to everybody. If you believe that and are willing to state publicly that bathrooms ought to be segregated by biological sex, that's what really triggered this judge. Uh, that was the opening salvo, if you will. Um, if you believe that you're at risk of losing your job in the city of Lynchburg. So I think there's a chilling effect by the city and I think the city is clearly saying we're not open to everybody. Um, with regard to Judge Judge Quattle bombs point that yes, Mr Dolan statement or Mayor Dolan statement that the city should have a zero tolerance policy. The city needs to take action against this. And then, uh, uh, Chief Wormser does what the mayor wanted him to do and fires, uh, Mr missions. As opposing counsel pointed out, the mayor has no authority to fire under the city's policy handbook. It is the fire chief. It is the department chiefs who have the final authority to fire and make those disciplinary decisions on behalf of the city. Um, it can be reviewed by the city manager, but it was not reversed by the city manager. So we did plead that there was, uh, uh, a final decision maker and we should, we should win on Monell. This court should again recalling this is a 12 B six motion. This court should reverse. Thank you, Your Honors. Thank you, Counsel. We will, um, come down and recounsel and then we will proceed in directly into our next case.
judges: J. Harvie Wilkinson III, Roger L. Gregory, A. Marvin Quattlebaum Jr.